IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

MASTERS V. MASTERS

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

LISA M. MASTERS, APPELLANT,

V.

ANDREW G. MASTERS, APPELLEE.

Filed January 16, 2024.    No. A-23-111.

Appeal from the District Court for Douglas County: SHELLY R. STRATMAN, Judge. Affirmed.

Matthew Stuart Higgins, of Higgins Law, for appellant.

James M. Buchanan, P.C., L.L.O., for appellee.

RIEDMANN, BISHOP, and WELCH, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Lisa M. Masters and Andrew G. Masters married in 2011; their son was born in 2013. Lisa filed for divorce the following year. In August 2017, the Douglas County District Court entered a decree dissolving the parties' marriage. Based on the parties' mediated parenting plan and agreed upon addendum, the court awarded the parties joint legal custody of their son, and awarded Lisa primary physical custody, subject to Andrew's parenting time which did not include overnights. Andrew was not to exercise overnight parenting time until recommended by the child's therapist in writing.

In December 2018, Andrew filed a complaint to modify the decree alleging a material change in circumstances. In its January 2023 modification order, the district court awarded Andrew sole legal custody of the parties' son as to medical decisions (including therapy, optical, dental, and mental health), school, and extracurricular activities that involve a sport; Lisa was awarded

- 1 -

sole legal custody as to religion and non-sport extracurricular activities. The parties were granted joint physical custody of their son with equal amounts of parenting time. Lisa was ordered to pay Andrew $8,000 for attorney fees. On appeal, Lisa challenges many of the court's determinations. Finding no abuse of discretion, we affirm.

## II. BACKGROUND

### 1. DIVORCE DECREE

The district court entered a decree dissolving the parties' marriage in August 2017. Based on the parties' mediated parenting plan and agreed upon addendum, the court awarded the parties joint legal custody of their son, and awarded Lisa primary physical custody, subject to Andrew's parenting time. Pursuant to the parenting plan, Andrew was to have regular parenting time for certain hours on specific days, including holidays. Additionally, the parties' son was to continue seeing his therapist, Mary Ellen Christ Anderson (Anderson), at a "frequency and duration determined by her," and Andrew was not to exercise overnight parenting time/visitation until recommended in writing by Anderson. Andrew was ordered to pay $606 per month in child support.

### 2. MODIFICATION ACTION

#### (a) Procedural Background

On November 14, 2018, Andrew filed a "Verified Application for Show Cause for Contempt" alleging that Lisa had denied him parenting time with their son since November 2, and she had refused all forms of communication. On December 26, Andrew filed a complaint to modify the decree, alleging there had been a material change in circumstances in that: both parties' circumstances had changed; Lisa routinely failed to follow the parenting plan, especially regarding legal custody and parenting time; Lisa made decisions detrimental to the child's wellbeing; Lisa refused to communicate regarding the child; and the child attained an age where the current parenting plan was no longer in his best interests. Andrew asked the court "for an Order reevaluating child custody, parenting time and support based on the [parties'] new parenting arrangement."

Throughout this case, numerous motions were filed and ruled upon, including motions to continue, for withdrawal of counsel, and for an in camera interview with the child. There were also numerous subpoenas issued, as well as motions to quash subpoenas and rulings thereon. We set forth only those pleadings and orders relevant to this appeal.

In an "Order to Continue Trial" entered on March 13, 2020, the district court ordered that "[Lisa's] oral motion to appoint Dr. Cyntia Topf as a 706 expert is granted." See Neb. Rev. Stat. § 27-706 (Reissue 2016) (judge-appointed expert witnesses). The court found that the parties had been engaging in regular counseling for the child with Dr. Topf. The court also found and ordered, "Since November 2019, recommendations have been made by Dr. Cynthia Topf increasing [Andrew's] parenting time," "[t]herefore, in [a]ddition to the parenting time previously stipulated to by the parties in November, 2019," Andrew would have additional parenting time. The order specifically referenced overnight parenting time going back to November, adjustments to

transition times going back to November, and upcoming dates when Andrew would begin to have parenting time from Friday at 5 p.m. to Sunday at 8 p.m. on his weekends.

Following a hearing on April 23, 2020, the district court entered an "Order for Further Temporary Allowances," finding and ordering that it was in the child's best interests that temporary legal and physical custody be placed with Andrew. The court found that Lisa "shall engage in individual and continue family therapy with Dr. Topf," and that should Lisa engage in individual therapy with a separate therapist, then that therapist "shall be allowed to confer with Dr. Topf to obtain any information related to this matter to assist in furthering therapy for [Lisa]"; Lisa was to follow all recommendations of Dr. Topf and her individual treating therapist. The court stated that "Dr. Topf shall determine when [Lisa] has properly expressed an understanding of how her actions have affected the minor child," and "[o]nce this has occurred, Dr. Topf may make recommendations as to how [Lisa's] parenting time will increase"; "[t]he parties shall abide by those recommendations as though they were ordered by this Court." The court found that starting April 23, Lisa's parenting time with the minor child was suspended, subject to the ongoing recommendations of Dr. Topf, the terms of the order, or until further order of the court. However, Lisa was to have telephonic and/or video visitation with the child every day for no more than 15 minutes per day. Andrew was to supervise the calls and be allowed to record them, and he was allowed to immediately end the conversation if Lisa began asking the child questions regarding alleged abuse, matters related to the case, or became distraught and emotional. Parenting time was to continue in this fashion until Dr. Topf made recommendations on how to properly increase parenting time, or until further order of the court. Andrew's child support obligation was suspended effective May 1.

On October 22, 2020, Lisa filed a motion to remove Dr. Topf as the district court's § 27-706 expert. Lisa alleged that she filed a complaint against Dr. Topf with the licensing board, and the relationship between them had deteriorated to a point where it was unworkable and a hinderance to the fair resolution of the case. Lisa's motion was denied.

On June 9, 2021, Lisa filed a "Motion for Further Temporary Orders and Motion to Vacate Prior Order and Motion to Remove 706 Expert." She asked the court for "a further temporary order, an Order vacating the Court's Orders of April 27, 2020, an Order removing Dr. Cynthia Topf as the court's 706 expert, an Order removing Dr. Glenda Cottam as the reunification counselor, and an order for attorney's fees." Following a hearing, the district court entered an order on July 7 denying Lisa's motion to vacate the April 27 order and her motion to remove the § 27-706 expert. The court found that "the 706 expert shall make an updated recommendation to the Court as to a parenting schedule consistent with the intention that after therapeutic sessions, [Lisa's] parenting would be increased." And "[u]pon receipt of the recommendations, the Court will enter a further temporary [sic] or set the matter for further hearing."

On August 18, 2021, Lisa filed a "Motion to Appoint Family Therapist" alleging that Dr. Cottam was no longer providing family therapy for Lisa and the child and the parties were unable to agree on a new family therapist and asking that Ashley Schrad be appointed as the family therapist.

On September 3, 2021, Lisa filed a motion "for an order vacating the Temporary Order . . . and for an Order Nunc Pro Tunc." As to the motion to vacate the temporary order, Lisa alleged that the terms of the order violated her due process rights and abdicated the court's authority to a

third party, "that being the Court's 706 expert who is acting in the capacity of a visitation master in violation of the law." As for the motion for an order nunc pro tunc, Lisa alleged that the order appointing Dr. Topf inaccurately recited that it was Lisa's attorney who requested that she be appointed as the court's expert, when in fact the request was made by Andrew's counsel.

Following a hearing on September 14, 2021, the district court entered an order denying the motion to vacate the temporary order. It stated that upon the written recommendations of Dr. Topf as to an updated parenting schedule as stated in the June 22 order, the court would enter a further temporary order to guide the parties until final disposition. The court entered an order nunc pro tunc that any reference to Dr. Topf shall now read, "'Court-appointed 706 expert.'" Finally, the court found that Lisa's motion to appoint a family therapist should be granted, however, the court appointed Jack Dross as the child's therapist, to begin sessions with the child with the understanding that family therapy would follow in a manner recommended by the therapist.

On December 16, 2021, Andrew filed a "Motion to Clarify 706 Expert Duties." In an order entered on January 26, 2022, the court stated that Dr. Topf shall have the following duties:

> Dr. Topf shall evaluate the child and the parties on an on-going basis so as to provide the Court and parties with her findings regarding custody and parenting time.

> Dr. Topf shall consult with Jack [Dross], the minor child's therapist, in consideration of her recommendations. Mr. [Dross] may provide opinions and suggestions to Dr. Topf to aid her in her findings and recommendations.

> From the entry of this order moving forward, Dr. Topf shall provide written updated findings to the Court and parties related to visitation no later than the 15th day of each month until further order of the Court.

### (b) Trial

Trial was held on October 17 and 18, and November 21, 2022. Several witnesses were called to testify, and numerous exhibits were received into evidence.

Lisa testified that at the time of the divorce, the parties agreed that Andrew would have parenting time every other weekend, every other Monday, and every Thursday, but that he would not have overnight parenting time. Andrew testified that their son, who was 3 years old at the time, had some separation issues leaving Lisa and was not quite ready to stay with him, and the child had not stayed with Andrew "throughout the whole divorce proceeding." The parties also agreed that their son would continue therapy with Anderson, his therapist of 6 or 7 months. Anderson was to determine when Andrew's overnight parenting time would begin.

According to Lisa, at that time, their son was making accusations that he was being hurt by Andrew, but Lisa still agreed to joint legal custody and to continue to work with Anderson because she hoped the accusations would stop. However, from the time of the decree in August 2017 until Andrew's complaint to modify was filed in December 2018, the child continued to say things to Lisa that led her to believe he was being abused at Andrew's house.

Lisa was asked why she believed her son was being abused. She said that when the child was 3 years old, she was wiping him, and he told her to be careful. When she asked why, he said "'my dad sticks his finger in my butt,'" and when Lisa asked if it was just one time or a bunch of times he said "'[a] bunch of times.'" Lisa said, "Another time he told me that his dad [stuck] something in his butt and he makes his butt bleed.'" Lisa did not talk to Andrew about those

allegations but did share them with Anderson; those allegations did not lead to charges against Andrew. Lisa also observed bruises "all up and down" the child's thigh. On another occasion, the child had injuries to his head and told Lisa that his father hit him with action figures; Lisa did not take her son to the doctor or contact child protective services (CPS) at that time. The child also reported that his father's wife pushed him off a bench. When Lisa confronted Andrew, he would deny it or say he did not know what she was talking about. The child also claimed his stepbrother "hit him so many times he couldn't count" and he "passed out." Lisa acknowledged that she had no way of knowing whether her son was telling the truth but said, "I see marks though."

Andrew confirmed that there had been many allegations made against him regarding his son both before and after entry of the divorce decree. After the entry of the decree, five or six complaints were filed against him. Andrew was usually notified "with a phone call from DHHS or a letter from DHHS or a call from a sheriff or something." Andrew always felt the allegations were coming from Lisa. Lisa did not allow Andrew to see their son for "[a]bout a week" in April or May 2018 because of a DHHS investigation. Andrew said he was cited with child abuse by neglect on November 1, 2018, but was later sent a letter "that they were not prosecuting." Lisa refused to let Andrew see their son "for the entire month of November" because of the child neglect citation, and he filed a contempt action against her. According to Andrew, there was never a no-contact order put in place stating that he was not allowed to be in possession of his son, he was never served with a modification from Lisa, and CPS never put a safety plan in place. Andrew did not see his son for "[c]lose to a month," but then his parenting time resumed as normal.

Andrew testified that right before Christmas in 2018, Lisa told him that Anderson was no longer working with their son because their son no longer trusted the therapist. Andrew believed their son needed to continue with a therapist. Also in December, Andrew filed his complaint to modify custody. In early 2019, Andrew received a phone call from the sheriff's office that a claim was made against him regarding the child, but "was just told right away it was unfounded." In March 2020, allegations were made that Andrew had put his penis on his son's cheek. Andrew said he was contacted by the Douglas County Sheriff's Office and was asked to take a polygraph test. Andrew agreed to take the polygraph and it was his understanding that he had "passed it." He had no further contact with law enforcement after that.

Lisa said that she called CPS on Andrew "probably, a couple times," but that "the medical doctors have called several times." She had to take her son to Project Harmony three times. The last time she took him to Project Harmony was in March 2020 for "[t]he penis by the mouth incident." She testified that the child had put his penis by her mouth; Lisa claimed that when she questioned her son about it, his response was that his father had done that to him. Lisa confirmed that the investigation did not lead to any charges against Andrew. She acknowledged that she was told that Andrew passed a polygraph test conducted by law enforcement, but she did not "know what he was asked."

Cynthia Topf has a doctorate degree in counseling and clinical psychology. She began working with this family in early 2019, prior to being appointed as the § 27-706 expert in April 2020.

Dr. Topf stated that she first met Lisa in January 2019 and learned that the child had previously been working with Anderson for several years. Dr. Topf also learned that there had been ongoing allegations of physical and sexual abuse against Andrew, so Lisa asked Dr. Topf to

continue to monitor that issue. Dr. Topf contacted Anderson and learned that there was "a lot of anxiety and hysteria around [the] allegations[s]" and there had been numerous reports to CPS. Dr. Topf was to help repair or create a relationship between the child and each of his parents. It was Dr. Topf's understanding that Andrew did not have any overnight parenting time at the beginning of 2019.

When Dr. Topf first started working with the child, he was 5 years old. The sessions initially focused on "get[ting] to know [the child]," "[h]is family orientation," and to "assess for physical or sexual abuse." At the time, the child did not have a close bond with Andrew and did not know much about him. Dr. Topf said that the child "would often look at Lisa when [she] was in session with him before he would answer things." Dr. Topf believed "he was seeking the approval [of Lisa] for whatever he would answer."

Dr. Topf met with the parents either shortly before or after sessions with the child. Dr. Topf noticed that Lisa "really believed that her son had been molested and hurt by his father, and did not appear to think that he should be a part, a big part of [the child's] life." As for Andrew, Dr. Topf said, "[O]ne of the things that struck me as important and relevant was he really wanted to be in [the child's] life, but he wanted to do it in the way that wouldn't be anxiety provoking or -- or cause [the child] any issues." Andrew also wanted Lisa "to be a large part of [the child's] life."

In March 2019, Dr. Topf sent a letter to Lisa's counsel describing two clinical goals. The first goal was to, "Help the family 'calm down'. In other words[,] work together for the best interests of [the child] and stop unnecessary CPS/police investigations." The second goal was to, "Work therapeutically with [the child] to help him have positive relationships with both parents. Ultimately he will realize that he can love both parents without making the other parent feel bad." Dr. Topf's assessment was that the child was "manifesting symptoms of an adjustment disorder, which is really . . . the mildest disorder we can diagnose someone with," "[a]nd usually its transitory," meaning that "it can easily be erased, it could easily be cured or changed."

In approximately the fall of 2019, Dr. Topf recommended an increase of Andrew's parenting time, including overnights. However, Lisa objected and claimed that the child was afraid to spend the night with Andrew, she did not think he was ready, and she had concerns about past abuse. It was Dr. Topf's understanding that some of the past allegations of abuse had been reported and were deemed unfounded. Up until April 2020, Andew's parenting time was increased despite Lisa's objections, and by March or April he was having parenting time every other weekend and one night a week, including overnights. After Andrew began having overnights, the child made allegations that Andrew hit him with an action figure. And just before April, Lisa told Dr. Topf, in front of the child, that Andrew had touched the child's penis. Dr. Topf said she "talked to [the child] individually and had him show me and -- and it looked like Dad was reaching over him to grab a Lego and may or may not have touched his penis," Dr. Topf did not find that reportable.

In April 2020, Dr. Topf provided an affidavit and attached letter to the district court about some issues related to the child. In her letter, Dr. Topf recommended that custody be changed over to Andrew because, as Dr. Topf testified, the child "had gone from an adjustment disorder diagnosis to a full-blown anxiety disorder with obsessive features." Dr. Topf stated that the child was "very emotional," and "was afraid his dad wanted to kill him with the van that he was riding in." His anxiety disorder sometimes manifested through behaviors "such as, he wouldn't want to eat off anybody's silverware other than his, even if it had gone through the dishwasher," "[h]e had

to have his own cup that nobody else would ever use," "[h]e was having a lot of daytime enuresis," and was "[v]ery anxious and teary."

Dr. Topf explained the van incident. She said Lisa called her because Andrew came to pick the child up in his work van that had no back seat, and Lisa did not think that she should let the child go because she did not know if it was legal. Dr. Topf encouraged Lisa to call "the local sheriff's office or someone," not 911, to find out. Instead, Lisa called 911 and when responders arrived, they looked up the statute and informed her that it was legal as long as the child was in a car seat. Dr. Topf, who was on the phone "for most of the whole event," said that Lisa was crying and screaming "'You're going to kill him. You want to kill [the child].'" Dr. Topf said she knew the child was present at the time because he was screaming and sobbing, and Dr. Topf asked Lisa to calm down for the child's sake, but she was not able to calm down. (During her testimony, Lisa said that she was not hysterical and "that's another lie" by Dr. Topf.) The child went with Andrew, but as later reported by both the child and Andrew, he cried the entire way home and thought Andrew was going to kill him.

Dr. Topf also wrote in her letter to the district court that Lisa remained "convinced that they 'torture [the child] and do stuff to him'" while he is on visits. When asked how Lisa believed the child was being tortured, Dr. Topf responded, "Well, I think the conversation had been about the fact that stepmom, Sara, had made [the child] share his stuffed animal if he wanted to share the other kids' stuffed animals, and [Lisa] thought that was unfair. And it went from there to his being tortured, treated unfairly."

The letter also referenced that Lisa reported that the child was afraid that his stepmother would "check 'down there'" to see if he had wet himself. Dr. Topf testified that the child and his parents all reported that he was wetting his pants. Lisa initially reported that she would check the child by putting her hand down his pants to see if he was wet, because he often was not wet, and that was how she would check him. Later, Lisa denied ever doing that, but then said, "'Well, maybe I did it one time.'"

At the time she wrote the letter in April 2020, Dr. Topf thought the child "was decompensating psychologically and emotionally." She said he "was manifesting more OCD symptoms and more anxiety. It was starting to interfere in his life." When asked where she thought this was coming from, Dr. Topf responded, "I think that was coming from Mom being around the allegations all the time." Dr. Topf felt that the child was at risk of psychological and emotional abuse from Lisa. Dr. Topf also believed that the child was being subjected to severe parental alienation by Lisa against Andrew and Andrew's family, and said the child reported that he did not feel safe letting Lisa know that he liked his father. Dr. Topf recommended that the child be placed with Andrew, and that Lisa only have phone contact for 30 days, followed by family therapy. Dr. Topf thought the child would be back with Lisa within 2 or 3 weeks after that, but that is not what happened because Lisa never participated in family therapy.

After the child was placed with Andrew, Dr. Topf met with Lisa via Zoom one time "and then she just kind of dropped out of sight after being invited and told that she needed to have a session with [the child] so the visitation could begin." Dr. Topf asked Lisa to set up the family therapy at least twice, and it was also Dr. Topf's understanding that family therapy was court ordered as well. However, family therapy never occurred between Dr. Topf and the parties.

According to Lisa, Dr. Topf never outlined what Lisa needed to accomplish to have her son put back in her care. Lisa said when she asked Dr. Topf what she needed to do, Dr. Topf told her that "the cure" was to build a relationship with Andrew and their son. Lisa did not believe that Dr. Topf took the accusations of abuse seriously.

At some point, Dr. Topf was made aware that Lisa had filed a complaint against her. According to Dr. Topf, that complaint did not cause a delay in therapy with the child, nor did it prevent her from being able to conduct family therapy between Lisa and the child. When asked if the complaint manifested a bias against Lisa, Dr. Topf replied, "No, . . . it did not." Dr. Topf said she got a letter from the State letting her know that the complaint was "dismissed and unfounded."

Dr. Topf testified regarding a June 2020 letter that she wrote to Lisa's counsel in response to questions from counsel. The child had been with Andrew for approximately 2 months at that time. Dr. Topf noted that the child had been taking responsibility for the fact that he had lied about physical and sexual abuse. In one of their sessions, Dr. Topf witnessed the child tell his father and stepmother that he had lied about those things. Later in June, Dr. Topf authored a clinical update, wherein she stated that the child was progressing well and that his anxiety had decreased. She stated that the child had developed a much stronger emotional bond and trust with Andrew and had a positive relationship with his stepmother and her children. Dr. Topf believed that Lisa and the child needed to engage in family therapy to repair their relationship.

According to Dr. Topf, it took Lisa until November 2020 to find a family therapist, Dr. Cottam, "[s]o all that time was wasted on reunification." Dr. Topf also worked with Dr. Cottam in relation to this family. At the end of November 2020, family therapy had begun, so Dr. Topf recommended that Lisa have supervised parenting time one evening per week for 3 hours and every other Sunday for 8 hours. Dr. Topf believed this plan was incorporated by the parties. At the end of January 2021, Dr. Topf recommended that Lisa's parenting time be unsupervised, and that they add 8-hour Saturdays to every other weekend. This would then transition to include Saturday overnights, and later Lisa's parenting time would begin on Friday at 4 p.m. and end on Sunday at 5 p.m. As for further recommendations/boundaries, the child was not to be taken to any healthcare provider without Andrew's consent, and there were to be no pictures of bruises or injuries because it reminded the child of past allegations of false abuse. In August 2021, Dr. Topf recommended making Lisa's weeknight parenting time an overnight, despite some concerns that Lisa was not supportive of the child's relationship with Andrew. In November, Dr. Topf observed the child's regression behaviors, i.e., lying about things that he did not have to lie about.

From April 2020 to January 2022, Dr. Topf was "[n]ot really" clear as to what her duties were as the § 27-706 expert. She testified that her recommendations during that time were not made as an expert. However, her duties as the § 27-706 expert were clarified in January 2022. Her understanding was that she was to "make recommendations to the Court regarding visitation and custody issues, to consult with . . . each of the parties and give monthly reports . . . and/or recommendations." When asked if she submitted monthly reports, Dr. Topf replied, "For the most part, there's a few weeks I missed." In February and March, Dr. Topf recommended increasing Lisa's parenting time to include more overnights, and by March the parties' parenting time was close to equal. Dr. Topf also recommended that Lisa have the child on designated days off school rather than sending him to daycare. In April, the child appeared to be doing well with the 50/50 parenting time schedule. In May, the only additional recommendation regarding parenting time

was to address summer vacation; each parent was to have up to 10 consecutive days. In June, Dr. Topf noted that Lisa did not feel that she was getting fair or equal visitation, even though she was getting the same number of days. The child was progressing well, and had a reduction in his symptoms, although he did have some mild regressions in his behavior, such as more tantrums and asking his parents if they loved him.

By mid-August 2022, however, Dr. Topf observed the child exhibiting behaviors that indicated parental alienation toward Andrew. For example, Dr. Topf said that "on at least two occasions with [the child] in the van, or in [Lisa's] car, while we were doing consultation, [Lisa], in front of [the child] would raise her voice," and when Dr. Topf asked her to lower her voice, Lisa would say, "'You lie in your report.'" Dr. Topf could see the child getting really quiet and when they talked about it the next day in her office, he said it made him sad. Additionally, Dr. Topf stated that the child reported that he and Lisa had nicknames for Andrew and his wife; they called Andrew "Temper" and his wife "Puke Monster." Dr. Topf testified that the child was starting to have "major tantrums" and "lash out at [Andrew] aggressively." Dr. Topf stated that the child's behaviors noticeably deteriorated after he was spending "a lot more than 50% of the time with Mom, and particularly after the 10-day vacation when he began reporting new and old allegations again." Lisa was spending more than 50 percent of the time with the child because she was allowed to watch him when Andrew's summer daycare plans fell through. In an August report, Dr. Topf recommended reducing Lisa's parenting time, specifically eliminating her Tuesday parenting time and her Sunday overnight (on her parenting weekend).

Lisa stated that she had "[v]ery few" meetings with Dr. Topf in the last 3 years, "only after the Court ordered it, I believe in was January 2022." Prior to that Lisa was under the impression that she could not contact her. Lisa described her communications with Dr. Topf as starting out friendly but becoming tense very quickly when Lisa would question her about things that she put in the court report that Lisa claimed were not true. Lisa believed that Dr. Topf was routinely lying in her reports and statements.

In August 2022, Dr. Topf believed the situation with the child needed intervention. She subsequently had a session with the parties and Dross, during which Lisa was asked two different times if she would be willing to consider that the allegations against Andrew and his wife might not be true. Lisa did not respond either time. In a phone consult in September 2022, Dr. Topf asked Lisa if she really believed the child was being harmed or hurt by his dad, and Lisa responded, "'Not every time.'" Dr. Topf stated that was notable because Lisa still believed that the child was being harmed and if she was not willing to "recognize that it didn't happen," then the child was going to continue to "align with her and make things up to please her . . . things she wants to hear[,]" "[h]e's said that since fall of 2019."

Dr. Topf was asked what she now believed was the best parenting time arrangement for the child. She testified that the goal could still be "50/50 physical custody," but that could not happen until the child and Lisa worked out "some of these issues to keep this whole thing from exploding again and false accusations." Dr. Topf also opined that it was in the child's best interest to continue with therapy.

On cross-examination, Dr. Topf was asked why she believed the child whenever he said things that tended to validate Andrew's view of things, but not when he said the opposite; in other words, how did Dr. Topf know when the child was telling the truth. Dr. Topf responded she did

- 9 -

not "know 100%," but the child "had little affect at all when he reported any type of abuse." He could not "explain certain sexual questions of when he alleged sexual abuse" and he did not seem "bothered by it." He did not know "there were going to be any consequences to anyone if he was believed, and he needed to know that." Dr. Topf stated that initially, the child was saying what he thought Lisa wanted to hear, and that he did not think there would be consequences for anyone, but that he may understand that now.

Jack Dross, a clinical therapist, was appointed in this case in September or October 2021. He initially did some family therapy, but mostly worked with the parties' child individually. Dross had approximately 45 sessions with the child in the past year. Dross observed that the child had a "[k]ind of a pseudo maturity," "he's short in stature, but . . . he's . . . powerful," and "he talks like he's about 12 or 13 sometimes." Dross had been made aware of a history of allegations made against Andrew going back 5 or 6 years, that the child had been "pushed, shoved, hit, [and] touched inappropriately." Dross tried to "help the parents co-parent better and more effectively," but most of the time he worked with the child "on how to manage both homes, how to get along better with his stepsiblings."

Dross' goal was to help the parties not let the child "triangulate them," i.e., "pulling in a third person to take a side." Dross stated that the child would complain about one parent or the other, and say things like, "'Well, this parent said this and the other parent said that,' to where it gets a little bit convoluted and confusing." Dross recommended to the parties that if the child told a story, "to maybe double-check on it," and "[t]o not bad-mouth the other parent." When asked if either parent spoke negatively about the other in Dross' presence at therapy, Dross stated, "mostly [Lisa], but occasionally I -- I would get complaints from [Andrew]"; the child was not present. When asked if he had any recommendations as to what the parties should be doing for their child going forward, Dross replied, "To be able to co-parent better and more effectively, to let go of past resentments, if you will." An impediment to forward progress is "worrying too much about what's going on at the other home when . . . you have no control over that"; "the majority" of the time, this has been Lisa.

As for the child, Dross' goal was to teach him to be more assertive in his communication with his family members and to give him a safe place to express his thoughts, feelings, and opinions. Dross stated that the child "would report that his dad was mean, his dad was loud, his dad would throw things, but most of the time it was complaining about the -- the other kids in the house," "[t]hings being unfair, the kids are mean to him," "[a] lot of victim kind of stuff." When asked if he believed the child when he said negative things about his dad, Dross replied, "I believe half of what he says, perhaps"; "I think kids tend to exaggerate," "[a]nd I always tell parents, kids are the best observers in the world, but the worst interpreters." Dross worked with the child on anger management techniques like taking time to himself, breathing, or shooting hoops.

During Dross' time working with the family, nothing has been reported to him by the child or the parents that has caused him to make a report to CPS or the authorities. When asked if, based on his observations and clinical review, he saw any issue with the child remaining in Andrew's home, Dross responded, "I don't think so." Dross had not observed any affection between Andrew and the child but said the child did not seem to be afraid of Andrew. Dross had observed that the child "seems very close to his mother" and had "seen them be affectionate [and] silly, [and] they seem to have fun together." According to Dross, the child "wishes he could have more time with

his mother," and "seemed pleased" when the parties' parenting time was a little more equal. Dross' "major concern is for [Lisa] to not be so interested in what goes on at the other house" "[b]ecause . . . that trickles down onto [the child]; the worry of that." To alleviate that concern, Dross suggested individual therapy for Lisa. When asked if Andrew should consider individual therapy as well, Dross replied, "Well, if there's truth to anger issues at that house, then I would say yes." Dross also thought the child should continue therapy, whether with Dross or someone else, because the child needs a place "to let it all out" and learn new coping skills. According to Dross, the biggest problem was the ongoing animosity between the parents. Dross believed that the child "will do better if [the parents] do better."

Andrew testified that his son was in kindergarten and doing homeschooling when Andrew was awarded temporary legal and physical custody in April 2020. However, Andrew was employed full-time and was not able to homeschool his son, so he made the decision to enroll him in public school for the fall of 2020. The child was still attending that school at the time of trial. Also, after getting custody in April, Andrew took the child to a new dentist and learned that he needed several teeth extracted, which Andrew arranged. Additionally, Andrew got his son caught up on all the recommended vaccinations. Lisa testified that after Andrew got custody, he changed their son's educational program and dentist without asking Lisa's opinion.

Andrew currently lived in a four-bedroom home with his son, his wife (Sara Masters), and his two stepchildren. Andrew said his son "feels that he's not special" because he has to share attention. Andrew also said that his son "yells, he's thrown things at walls," "[h]e's very disruptive toward all the children," and "[h]e's been violent towards myself and my spouse." When asked if he did that before he got primary custody or if it had been more recent, Andrew replied, "No, more recent."

Andrew believed that the parties' son needs both parents, and Andrew "would be happy" if the parenting time schedule remained "what it is now." He said that Lisa currently had parenting time one day during the week and alternating weekends. When asked why he believed that was in the child's best interests, Andrew replied, "Because I believe his attitudes and his aggressiveness changes the more time he spends with his mom." Andrew would also not have an issue if the court found it was in the child's best interests to have equal time with both parents. However, Andrew believed he should have legal custody "[b]ased on [the child's] dental history and vaccination history, which were not handled or taken care of . . . previous to myself getting full custody temporarily," and because Andrew "felt [Anderson] should have stayed on initially" and that the child should continue in therapy.

Lisa testified that her son used to be "happy" and would laugh all of the time, but she had not seen that "since he was taken away"; "he's changed." Lisa's relationship with her son was "destroyed" by "[t]he process of the court, along with [Andrew and his wife] and [Dr. Topf]." She said, "When a child is ripped out of their home, and it's reinforced that the mother's not doing anything to see them, that's going to injure a relationship." Lisa said her son thought she walked away from him, but their relationship is "slowly improving." The increase in her parenting time "was helping," but "[i]t got worse when the time was taken away, again, in August." When asked if her son was still making allegations of being "manhandled or harmed" at his father's home, Lisa replied, "Yes." On cross-examination, Lisa was asked if it was fair to say that she based the allegations about Andrew on what their son reports, and she replied, "And the marks that I see."

She said a "couple weeks ago," the child had "what appeared[] to be fingerprints on his legs again," and he said his father "threw him"; Lisa did not ask Andrew about it or contact the authorities. Lisa believed that Andrew was an unfit parent and she wanted sole legal and physical custody of the parties' child.

Stacy Vaughn, a licensed independent mental health practitioner, was Lisa's therapist and had seen her "almost weekly" since February 2020. In May 2020, Vaughn spoke with Dr. Topf after Lisa's parenting time was limited to 15-minute phone calls; she asked Dr. Topf what recommendations she had for Lisa. Vaughn said that Dr. Topf's response was that this was the only solution and that Vaughn had not been working with Lisa long enough and that if Vaughn spoke to Andrew she would learn about her client. Two days later Vaughn spoke with Dr. Topf on the phone and Dr. Topf accused her of either recording their conversation 2 days prior or allowing Lisa to be in the room during that prior call. Vaughn denied both, but Dr. Topf refused to accept that answer. Dr. Topf told Vaughn she would not work with her.

Vaughn had been working with Lisa for more than 2 years and had learned that she was a "very loving mother" who cared deeply about her son. Vaughn believed that Lisa was "conflicted in the beginning in regards to if there was physical or any sexual abuse going on with her son and his father." Vaughn thought Lisa had been able to resolve some of that, but that Lisa still had concerns. According to Vaughn, Lisa had a firm grasp on reality and did not strike Vaughn as delusional.

Lisa's pastor testified that Lisa was a "straight shooter," "pretty direct, what she has to say about something." The pastor had never known the parties' child to be deceitful or lie.

Helen Wyman, Lisa's mother, testified that she saw Lisa almost daily and the child at least four or five times a week. According to Wyman, Lisa is a very good parent. When asked if she had reason to believe that the child had been abused by either Andrew or his wife, Wyman responded, "I don't know." After Dr. Topf recommended a change in custody, Wyman noticed a change in the child's behavior; he was "very irritable and anxious" and "aggressive to his dogs, to Lisa and me, things that we never saw before."

Lance Molina is Sara's ex-husband, and they have two children together. Molina received a string of text messages from Sara "about two years ago in January," that were not actually meant for him but for Sara's mother. The messages led Molina to believe that the children were in danger, "and at the time, my ex-wife agreed"; "In fact, the very next day, the children were at my house, despite not being my parenting time." In the text, which was received into evidence and testified to by Molina, Sara recounted an incident when Andrew was mad, yelling and swearing, and she had her children stay in their rooms "to be safe."

The parties' child, who was 8 years old at the time, testified in camera, but we will not recount his testimony here.

### (c) District Court's Order

The district court entered its order of modification on January 23, 2023. The court found that Andrew had met his burden to prove that a material change in circumstances had occurred that affected the best interests of the child and justified a modification of custody, the parenting plan, and child support. The court found that the child "shall continue therapy with Mr. Dross, or other therapist so the minor child has, 'A safe place to let it all out and learn coping skills and utilize

them.'" The court awarded Andrew sole legal custody of the child as to medical decisions (including therapy, optical, dental, and mental health), school, and extracurricular activities that involve a sport; Lisa was awarded sole legal custody as to religion and non-sport extracurricular activities. The parties were granted joint physical custody of the child, subject to an attached parenting plan. Andrew was ordered to pay $300 per month in child support. Lisa was ordered to pay Andrew $8,000 in attorney fees. The parties were "to split the fees related to Dr. Topf evenly."

Lisa appeals.

## III. ASSIGNMENTS OF ERROR

Lisa assigns 12 errors, which we consolidate and restate as follows: That the district court erred in (1) its temporary order of modification, (2) appointing the child's therapist as its § 27-706 expert, and by not giving clear instructions as to the expert's duties, (3) sustaining objections to Lisa obtaining text communications between Andrew's wife and her mother, (4) finding a material change in circumstances, (5) some of its specific findings of fact based on the record, and (6) ordering her to pay attorney fees.

## IV. STANDARD OF REVIEW

Modification of a judgment or decree relating to child custody, visitation, or support is a matter entrusted to the discretion of the trial court, whose order is reviewed by an appellate court de novo on the record, and will be affirmed absent an abuse of discretion. *Lindblad v. Lindblad*, 309 Neb. 776, 962 N.W.2d 545 (2021).

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by these rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *Brown v. Morello*, 308 Neb. 968, 957 N.W.2d 884 (2021). The exercise of judicial discretion is implicit in determining the relevance of evidence, and an appellate court will not reverse a trial court's decision regarding relevance absent an abuse of discretion. *Id.*

In an action for modification of a marital dissolution decree, an award of attorney fees is discretionary with the trial court, is reviewed de novo on the record, and will be affirmed in the absence of an abuse of discretion. *Tilson v. Tilson*, 307 Neb. 275, 948 N.W.2d 768 (2020).

## V. ANALYSIS

### 1. TEMPORARY ORDER

Lisa assigns that the district court erred when it entered a temporary order without a finding of unfitness or a finding that an emergency existed justifying a temporary change in custody. She also assigns that the court erred when, by the terms of the temporary order, it delegated its authority to a third party (psychologist) such that the third party was given control over the frequency, duration, and manner of Lisa's parenting time. However, any temporary custody and parenting time issues became moot once the order of modification was entered. See *State on behalf of Pathammavong v. Pathammavong*, 268 Neb. 1, 679 N.W.2d 749 (2004) (issue of ex parte temporary custody order only relevant from time it was ordered until it was replaced by order determining permanent custody; therefore, issues pertaining to temporary order were moot and did not need to be addressed on appeal).

## 2. § 27-706 EXPERT

Lisa claims that the district court erred when it appointed the child's therapist, Dr. Topf, as its § 27-706 expert, and by not giving clear instructions as to the expert's duties.

Section 27-706(1) states in relevant part,

The judge may appoint any expert witnesses agreed upon by the parties, and may appoint witnesses of his own selection. . . . A witness so appointed shall be informed of his duties by the judge in writing, a copy of which shall be filed with the clerk, or at a conference in which the parties shall have opportunity to participate. A witness so appointed shall advise the parties of his findings, if any; his deposition may be taken by any party; and he may be called to testify by the judge or any party. He shall be subject to cross-examination by each party, including a party calling him as a witness.

Lisa claims the district court erred when it appointed Dr. Topf as its § 27-706 expert, "and by doing so allowed Dr. Topf to contaminate the evidence." Brief for appellant at 28. There is nothing in our record to show that Lisa ever objected to the appointment of a § 27-706 expert, or to Dr. Topf being that expert, when a § 27-706 expert was initially appointed. Subsequently, however, Lisa twice filed motions to have Dr. Topf removed as the § 27-706 expert, and both times her motions were denied.

Throughout this case, Dr. Topf was tasked with making recommendations regarding custody and parenting time. In the district court's January 2022 order clarifying the expert's duties, Dr. Topf was also to provide written updates to the court. And in its "Specific Findings of Fact and Conclusions of Law" incorporated into the order of modification, the district court noted that following the complaint to modify, the parties "agreed to utilize the services of Dr. Topf to address the stories the minor child was telling about Andrew." The court also recounted Dr. Topf's recommendations regarding custody and parenting time as the case progressed.

Lisa contends that Dr. Topf, "[b]y her manipulation of the circumstances and her later partisan remarks . . . contaminated the very facts at issue that she was tasked to explain." Brief for appellant at 29. We view Lisa's argument as challenging Dr. Topf's credibility as a witness. However, witness credibility and the weight to be given a witness' testimony are questions for the trier of fact. *Amanda F. v. Daniel K.*, 313 Neb. 573, 984 N.W.2d 909 (2023). See, also, *Gandara-Moore v. Moore*, 29 Neb. App. 101, 952 N.W.2d 17, (2020) (all conflicts in evidence, expert or lay, and credibility of witnesses are for fact finder and not for appellate court).

## 3. TEXT COMMUNICATIONS

On March 4, 2021, Lisa filed a "Notary Public Deposition Subpoena Duces Tecum," commanding Sara Masters (Andrew's wife) to appear at Lisa's attorney's office for a deposition and commanding her to bring with her "[a]ll text messages" between her and her mother from April 24, 2020, to the present date. Sara objected and filed a motion to quash the subpoena. The district court sustained Sara's objections and motion to quash.

Lisa contends the text messages would have contradicted Dr. Topf's conclusions that the claims of the child, and consequently Lisa's reports of those claims, were without merit. Specifically, Lisa argues that "evidence of the truth of these accusations were let slip by Sara" "[i]n a text intended for her own mother," but accidently sent to her ex-husband, Molina. Brief for

appellant at 38. In the text, which was received into evidence and testified to by Molina, Sara recounted an incident when Andrew was mad, yelling and swearing, and she had her children stay in their rooms "to be safe." Lisa wanted the opportunity to find out what else Sara may have texted to her mother relevant to Andrew's behavior. Lisa acknowledges the court's discretion in such matters but argues that the court "failed to clearly judge the relevance and importance of the information such a subpoena would reveal." *Id*. at 41.

As acknowledged by Lisa, it was in the district court's discretion to determine that the text messages between Sara and her mother were not relevant. Also, as noted by Andrew in his brief, Sara, having been subpoenaed to testify as a witness by Lisa, was present for trial. However, Sara was never called as a witness. Thus, "Lisa essentially waived examining Sara . . . and addressing the 'concerns.'" Brief for appellee at 26.

### 4. MODIFICATION OF CUSTODY

Ordinarily, custody of a minor child will not be modified unless there has been a material change in circumstances showing either that the custodial parent is unfit or that the best interests of the child require such action. *Jones v. Jones*, 305 Neb. 615, 941 N.W.2d 501 (2020). The Nebraska Supreme Court has described this showing as a two-step process: First, the party seeking modification must show a material change in circumstances, occurring after the entry of the previous custody order and affecting the best interests of the child. See *id.* Next, the party seeking modification must prove that changing the child's custody is in the child's best interests. *Id.*

### (a) Material Change in Circumstances

A material change in circumstances is the occurrence of something which, had it been known to the dissolution court at the time of the initial decree, would have persuaded the court to decree differently. *Id.*

Lisa contends there was no material change in circumstances between the August 2017 decree and when Andrew filed his complaint to modify in December 2018; rather, any change in circumstances was the result of the district court's temporary order in April 2020 and Dr. Topf's actions. Lisa notes that at the time of the filing of the modification action, Andrew had no overnight parenting time with their son.

Prior to the divorce decree, the parties' son made allegations of harmful conduct by Andrew. The parties agreed during their divorce that Lisa would have physical custody of the child, with Andrew having specified parenting time, not to include overnights. The child would continue to see his therapist, Anderson, who would make recommendations as to when Andrew could have overnight parenting time. Anderson had not made recommendations for overnight parenting time prior to Lisa's termination of her as the child's therapist in late 2018. In its order of modification, the district court noted that the addendum to the parenting plan violated the law by delegating decision-making authority regarding parenting time to a third party. The court also stated that "the decree did not account for the potential for one parent to have the power to greatly impact the other regarding an increase or progression to visitation including overnights by ending the relationship between the third party therapist and the minor child." The record also reflects that prior to Andrew filing a motion to modify in December 2018, he filed a contempt action against Lisa because she withheld his parenting time for most of November 2018. Thus, there was clearly

a change in circumstances between the August 2017 decree and when Andrew filed his complaint to modify in December 2018. The court considered the change in circumstances occurring prior to when Andrew filed his complaint for modification, as well as those that occurred during the pendency of the modification action.

Lisa contends the district court erred when it changed custody "relying on circumstances created by the Court's 'temporary' change in custody, and created by It's delegation of authority to the Court's 706 Expert." Brief for appellant at 33. Lisa states, "There is no doubt that had Dr. Topf not laid on her 'diagnosis' that [Lisa] was alienating [the child] and her condemnation of [Lisa], the Court would have never given her the authority that it did." *Id.* at 35. Lisa argues that "Dr. Topf's work, opinion and directives have made matters worse all around," and that the child's behavior had changed in a negative way. *Id.* Lisa also suggests that "at some point," Dr. Topf "became acutely partisan to the point that all of [Andrew's] behavior was praised or excused away, [Lisa's] behavior was criticized as abusive and delusional, and [the child's] reports of abuse were judged false, and motivated by a desire to please his mother." *Id.* at 37.

Lisa's criticism of Dr. Topf's work in this case is essentially a challenge to Dr. Topf's credibility as a witness. However, as stated previously, witness credibility and the weight to be given a witness' testimony are questions for the trier of fact. *Amanda F. v. Daniel K., supra*. See, also, *Gandara-Moore v. Moore, supra* (all conflicts in evidence, expert or lay, and credibility of witnesses are for fact finder and not for appellate court).

### (b) Specific Findings of Fact

### (i) Relationship Between Andrew and Child

Lisa claims the district court erred when it found the relationship between Andrew and the child was greatly interfered with when Lisa disagreed with the recommendation of the court-ordered child therapist, Anderson, which would have led to more parenting time, including overnights, with Andrew. Lisa specifically points to the court's finding that "Plaintiff Mom stopped taking the minor child to . . . Anderson after it was expected her recommendations would include more time and overnight visitation with Defendant Dad."

The evidence at trial was that pursuant to the addendum to their parenting plan in their August 2017 divorce, the parties' child would continue with a therapeutic relationship with Anderson, and that Andrew would not exercise overnight parenting time until recommended in writing by Anderson. Andrew met with Anderson "once a month." He and the child last met with Anderson in October 2018 because the following month, Lisa cancelled the appointment with Anderson. Lisa told Andrew that Anderson would no longer be working with the child. According to Andrew, Lisa told him that she did not agree with Anderson anymore and that their son did not trust her anymore. At that time, Anderson had made no written recommendations for Andrew to have overnight parenting time. Andrew testified that he was "expecting" overnights but had not been given any indication that they were about to start.

Although the district court may have speculated that the reason Lisa ended the relationship with Anderson was because of a forthcoming overnight parenting time recommendation, the evidence nevertheless supports that Lisa unilaterally terminated the child's relationship with Anderson without any advanced discussion with Andrew. Notably, this occurred at the same time Lisa was denying Andrew parenting time with their son. Further, Lisa averred in her June 2021

affidavit that post-decree, Anderson "tentatively and conditionally concluded that the boy told stories that were untrue, lying about seemingly inconsequential things" and Anderson claimed to "have caught him doing this in real time in her presence." Regardless, Lisa claimed none of the child's "stories of sex and physical abuse could be proved false." Clearly, Anderson's doubts about the child's credibility contributed to Lisa terminating her services as the child's therapist; Lisa likewise sought the termination of Dr. Topf for similar and other reasons. Any misstatement by the district court in its finding regarding Anderson does not affect the outcome of this case.

Lisa also claims the district court erred in finding that after working with Dr. Topf for over a year, the child made significant progress and the relationship between the child and Andrew had greatly improved. Lisa argues that, except for Dr. Topf's testimony, the evidence tended to show that the behavior of the child and the relationship between the parties deteriorated during the pendency of the case. However, as noted by Andrew, the child's current therapist, Dross, testified that the child improved, especially when parenting time equalized, and the court referenced Dross' testimony, in addition to Dr. Topf's, in finding that it was in the child's best interest for parenting time to be equal. In child custody cases, where the credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Eric H. v. Ashley H.*, 302 Neb. 786, 925 N.W.2d 81 (2019). We find no abuse of discretion in the district court's finding that, after working with Dr. Topf, the child made progress and his relationship with Andrew improved.

### (ii) Safety Plan

Lisa claims that the district court erred when it found that none of the reports to CPS amounted to any safety plan or charges. She states that Andrew "admitted that he has been charged (cited) with child abuse by neglect." Brief for appellant at 46. At trial, Andrew did state that he was cited for child abuse by neglect in November 2018, but he also stated that he was later sent a letter that "they were not prosecuting." As to a safety plan, Andrew denied that CPS ever put a safety plan in place; he did note that during a DHHS investigation in April or May 2018, DHHS told him he could not get his weekend with his son, but after 1 week he resumed his parenting time. We find no abuse of discretion in the district court's findings regarding a safety plan or charges against Andrew.

### (iii) Ability to Communicate

Lisa claims the district court erred in finding the parties' ability to communicate (or coparent) to make joint parenting decisions had become so difficult as to make the requirement that the parties reach a consensus on fundamental parenting decisions impractical. Lisa argues that prior to Dr. Topf's involvement and the April 2020 temporary order, the parties' communication was "predominately dispute free -- pertinent to religion, religious practices and beliefs or medical or dental care or choice of providers"; and that it was only afterwards that "we then see rancor." Brief for appellant at 43.

At the time of trial, there was testimony about disagreements between the parties about the child's schooling, church attendance, and activities, as well as therapy providers and professional assessments. The district court found that, based on the evidence adduced and the testimony of

both of the parties and therapists, joint legal custody was not feasible. We find no abuse of discretion in the district court's finding.

### (c) Best Interests

When determining the best interests of the child in the context of custody, a court must consider, at a minimum, (1) the relationship of the minor child to each parent prior to the commencement of the action; (2) the desires and wishes of a sufficiently mature child, if based on sound reasoning; (3) the general health, welfare, and social behavior of the child; (4) credible evidence of abuse inflicted on any family or household member; and (5) credible evidence of child abuse or neglect or domestic intimate partner abuse. *Jones v. Jones*, 305 Neb. 615, 941 N.W.2d 501 (2020). Other relevant considerations include stability in the child's routine, minimalization of contact and conflict between the parents, and the general nature and health of the individual child. *Id.* No single factor is determinative, and different factors may weigh more heavily in the court's analysis, depending on the evidence presented in each case. *Id.* The one constant is that the child's best interests are always the standard by which any custody or parenting time determination is made. *Id.*

The record reflects that both prior to the parties' divorce and after, the child made allegations of harmful conduct by Andrew. However, despite numerous reports by Lisa and others to CPS and law enforcement, the investigated claims were deemed unfounded. Mental health professionals also noted that the child admitted to lying about being abused. However, Lisa continued to believe that that child was being harmed. The child also testified in camera, allowing the district court to weigh the child's credibility. Although Lisa disagrees, there was testimony in the record that the child's behavior improved when the parties had equal parenting time.

Having reviewed the record and considered the best interest factors set forth above, we find that the district court did not abuse its discretion in awarding the parties' joint physical custody of the child with equal amounts of parenting time.

Nor do we find any abuse of discretion in the district court's decision to award (1) Andrew sole legal custody of the child as to medical decisions (including therapy, optical, dental, and mental health), school, and extracurricular activities that involve a sport; and (2) Lisa sole legal custody of the child as to religion and non-sport extracurricular activities.

### 5. ATTORNEY FEES

Lisa claims that the district court erred by finding that "[d]ue to the delays, the NDHHS complaint regarding the therapist causing significant delay, and noted disruptions," she should pay Andrew $8,000 for attorney fees, and that the court erred by failing to award her attorney fees. Lisa argues that "[t]he reasons for the delay of the trial were various and made by [Andrew], [Lisa] and on the Court's Motion for reasons ranging from Covid, to the incomplete work of counselors, to illness," and that the investigation of Dr. Topf was no reason to put the case on hold. Brief for appellant at 44. Lisa believes that the award of fees to Andrew was unfair, noting that she had incurred more than $100,000 in fees herself. Additionally, "if the Court accepts [her] argument as to why the case became such a drawn out affair (because of Dr. Topf) she should be awarded fees for having to try and undo the consequences of the Judge's unlawful Order, and [Andrew's] exploitation of the authority it gave to him." *Id.*

Attorney fees and expenses may be recovered only where provided for by statute or when a recognized and accepted uniform course of procedure has been to allow recovery of attorney fees. *Garza v. Garza*, 288 Neb. 213, 846 N.W.2d 626 (2014). Customarily, attorney fees are awarded only to prevailing parties or assessed against those who file frivolous suits. *Id*. A uniform course of procedure exists in Nebraska for the award of attorney fees in dissolution cases, and thus, there is authority to award attorney fees when modifying such cases. See *id*. It has been held that in awarding attorney fees in a dissolution action, a court shall consider the nature of the case, the amount involved in the controversy, the services actually performed, the results obtained, the length of time required for preparation and presentation of the case, the novelty and difficulty of the questions raised, and the customary charges of the bar for similar services. *Id.*

Andrew filed his complaint to modify in December 2018, trial was finally had in October and November 2022, and the district court's modification order was entered in January 2023. We note that during the progression of this case, Lisa changed counsel more than once, with her current counsel in and out of this case at least three times. In its modification order, the district court set forth "the many occurrences which transpired and [led] to significant delays in the progression of this case." We find no abuse of discretion in the court's award.

## VI. CONCLUSION

For the reasons stated above, we affirm the district court's order of modification entered on January 23, 2023.

AFFIRMED.